517 So.2d 1346 (1987)
Carl Daniel LOCKETT
v.
STATE of Mississippi.
No. DP-67.
Supreme Court of Mississippi.
September 30, 1987.
Rehearing Denied January 13, 1988.
*1347 Clive Stafford Smith, Bryan A. Stevenson, Atlanta, Ga., for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Marvin L. White, Jr., Asst. Atty. Gen., and Donald G. Barlow, Sp. Asst. Atty. Gen., Jackson, and Orbie Craft, Dist. Atty., Brandon, for appellee.
En Banc.
*1348 DAN M. LEE, Presiding Judge for the Court:
Carl Daniel Lockett appeals his conviction of capital murder and death sentence for the murder of Geraldine Calhoun. Lockett's separate appeal of his conviction of capital murder and second death sentence for the related murder of Geraldine's husband, John Calhoun, also is today affirmed. Lockett v. State, 517 So.2d 1317, 1987 (hereinafter Lockett I).
The facts of this case flow from the double murder of John and Geraldine Calhoun, prominent residents of the Puckett community in Rankin County, Mississippi. The brutal details of the slayings are graphically set forth in Lockett I and need not be recited here.
Lockett's trial for the killing of Geraldine Calhoun proceeded after he had been sentenced to death for the killing of John Calhoun. Evidence presented in the two cases is strikingly similar, both in substance and order of presentation. Trial proceedings in the present case, however, evidence a unique feature unrelated to the trial in Lockett I, i.e., the presence of a timely jury selection challenge based on Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Many assignments of error in the two appeals are similar and those assignments substantially controlled by Lockett I will be discussed following our discussion of the assignments unique to this case.

I.

Did the State's Racially Discriminatory Abuse of Peremptory Challenges Violate Mr. Lockett's Rights to a Representative Jury and Equal Protection under the Sixth and Fourteenth Amendments?
Lockett initially complains of the lower court's handling of jury selection and specifically invokes the relatively new protections of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). While we have heretofore addressed both the questions of retroactive application of Batson, see Harper v. State, 510 So.2d 530 (Miss. 1987), Williams v. State, 507 So.2d 50 (Miss. 1987), Caldwell v. State, 517 So.2d 1360 (Miss. 1987), and the procedural burden borne by one raising the issue for appellate review, see Jones v. State, 517 So.2d 1295 (Miss. 1987), Thomas v. State, 517 So.2d 1285 (Miss. 1987), we address for the first time in this case the question of whether the prosecutor's peremptory challenges on minority veniremen were supported by "neutral explanation(s) related to the particular case to be tried." Batson. 476 U.S. 98, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. Concomitant to our examination of the district attorney's motives, we are required to briefly delineate the components of a Batson claim and the proper role of an appellate court in reviewing a trial court's handling of the issue.
The record reflects that during voir dire, the district attorney alerted the court to the rendition of Batson v. Kentucky, decided only a few days prior to the beginning of Lockett's trial. To forestall any Batson issue and to fully develop the record, the prosecutor volunteered to state into the record reasons for all peremptory challenges exercised by the state. In this context, the prosecutor proceeded to strike the five black veniremen from the panel. On proper defense objection, the trial judge entertained the prosecutor's explanation of the strikes and ultimately held them to be racially neutral. Lockett's counsel reiterated his jury challenge in his motion for new trial and filed a separate assignment of error on this ground.

A. The Command of Batson.

In Batson v. Kentucky, supra, the United States Supreme Court finally accepted the oft-extended invitation to reassess the viability of the rule of law protecting minority defendants from the systematic exclusion through peremptory challenge of minority veniremen from jury panels. Specifically, Batson appeared before the high court for reexamination of
that portion of Swain v. Alabama, 380 U.S. 202 [85 S.Ct. 824, 13 L.Ed.2d 759] (1965), concerning the evidentiary burden placed on a criminal defendant who claims that he has been denied equal *1349 protection through the State's use of peremptory challenges to exclude members of his race from the petit jury.
476 U.S. at 82, 106 S.Ct. at 1714, 90 L.Ed.2d at 77. Approaching the issue from an equal protection slant rather than the "fair cross-section" argument proposed by Batson's attorneys, the Court held, in pertinent part, that
... a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant must first show that he is a member of a cognizable racial group. Castaneda v. Partida, supra, [430 U.S. 482], at 494, 51 L.Ed.2d 498, 97 S.Ct. 1272 [1280], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of mind to discriminate." Avery v. Georgia, supra [345 U.S. 559], at 562, 97 L.Ed. 1244, 73 S.Ct. 891 [892]. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empanelling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful dsicrimination.
476 U.S. at 96, 106 S.Ct. at 1722-23, 90 L.Ed.2d at 87. (emphasis added). See also, U.S. v. Mathews, 803 F.2d 325 (7th Cir.1986).
It is thus clear under Batson's express terms that a defendant raising a Batson claim must show
1. That he is a member of a "cognizable racial group";
2. That the prosecutor has exercised peremptory challenges toward the elimination of veniremen of his race, and
3. That facts and circumstances infer that the prosecutor used his peremptory challenges for the purpose of striking minorities.
In sum, these components constitute the prima facie showing of discrimination necessary to compel the "state to come forward with a neutral explanation for challenging black jurors."[1]Batson, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88.
We need not engage in a careful analysis of Lockett's zeal in raising this issue in light of the prosecutor's voluntary adherence to that part of Batson dealing with expression of his motives for minority challenges. We thus assume for purposes of this opinion that a prima facie showing was made, triggering the mandate that the prosecutor present "`a clear and reasonably specific' explanation of his `legitimate reasons' for exercising the challenges." Id., 476 U.S. at 98, n. 20, 106 S.Ct. at 1723, n. 20, 90 L.Ed.2d at 88, n. 20.
These explanations form the object of our scrutiny. They do not, however, clearly answer an equally important threshold question centering in the scope and form of review by which we should conduct our analysis. Batson clearly places upon the trial court the duty to determine whether purposeful discrimination has been shown and likens this fact to analogous findings in a Title VII sex discrimination suit. These findings largely turn on credibility and thus Batson states that "ordinarily," a reviewing court should give the trial court "great deference." Id. at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 89, n. 21.
"Great deference" has been defined in the Batson context as insulating from appellate reversal any trial findings which are *1350 not clearly erroneous. United States v. Mathews, supra; Gamble v. State, 257 Ga. 325, 357 S.E.2d 792, 794 (1987); State v. Butler, 731 S.W.2d 265, 271 (Mo. Ct. App. 1987); Yarbough v. State, 732 S.W.2d 86, 91 (Tex. Ct. App. 1987); Rodgers v. State, 725 S.W.2d 477, 480 (Tex. Ct. App. 1987); Chambers v. State, 724 S.W.2d 440, 442 (Tex. Ct. App. 1987).
We today follow the lead of other courts who have considered this issue and hold that a trial judge's factual findings relative to a prosecutor's use of peremptory challenges on minority persons are to be accorded great deference and will not be reversed unless they appear clearly erroneous or against the overwhelming weight of the evidence. This perspective is wholly consistent with our unflagging support of the trial court as the proper forum for resolution of factual controversies.
Where the judge makes findings of fact.
See, e.g., Ford v. Lamar Life Ins. Co., 513 So.2d 880 (Miss. 1987) (chancellor's finding of fact will not be disturbed on appeal unless manifestly wrong); Brown v. Williams, 504 So.2d 1188 (Miss. 1987) (same); Dillon v. Dillon, 498 So.2d 328, 330 (Miss. 1986) (same); Country Club of Jackson v. Saucier, 498 So.2d 337, 339 (Miss. 1986) (same); Wiley v. State, 465 So.2d 318, 320 (Miss. 1985) (same); Cf., Neal v. State, 451 So.2d 743, 756 (Miss. 1984) (same); See also, Merrill v. State, 482 So.2d 1147, 1151 (Miss. 1986) (citing Neal v. State);
Where the trial court determines the reliability of an in-court identification. See e.g., Ray v. State, 503 So.2d 222, 223-24 (Miss. 1986) ("We may, of course, disturb such a finding only where there is an absence of substantial credible evidence supporting it.); Compare, J.L. Teel Co., Inc. v. Houston United Sales, Inc., 491 So.2d 851, 859 (Miss. 1986) (a circuit court's finding of fact will not be disturbed if there be "substantial supporting evidence.").

B. Sufficiency of the Batson Challenges.
With our review so focused, we turn to the present facts to assess whether the trial court erred in deciding that the prosecutor did not discriminate in his use of peremptory challenges.
The prosecutor used five of his first seven challenges to eliminate all black jurors from the venire. The defendant objected to the use of these challenges during voir dire and expressed the opinion that the reasons stated for the challenges were insufficient to overcome his theory of racial bias. As noted, we consider this question ripe for review.
The following black jurors were struck with the corresponding reasons given:
1 1) A single, 22-year-old laborer with an eleventh-grade education was stricken because his youth, marital and educational level appeared to the prosecutor to indicate instability.
2) A 49-year-old minister/bus driver who was married and had an eleventh-grade education was stricken because he was a preacher.
3) A 35-year-old housewife who finished the 12th grade was removed because she did not reveal her brother's conviction of armed robbery.
4) A 38-year-old married cafeteria hostess with a 12th-grade education was challenged because of her concerns about sequestration, due to her having to care for an invalid mother.
5) A single, 25-year-old who went through the 12th grade and was stricken from the panel because he wore a hat into the courtroom, and because his general demeanor suggested to the prosecutor that he was unstable, unconcerned, and had no respect for the proceedings.
During later voir dire, the trial court made the following comments relative to defendant's objection to the exclusion of the five blacks from the jury:
Well, of course, as we all know, we need some substantial guidelines on this issue about what are proper reasons and not. I can say that were I a prosecutor I would not want if I were seeking a death penalty a young, twenty-five year old, *1351 single male if I had the availability of older, more settled potential jurors. It wouldn't matter to me what race they were. I would not want a young, single juror with a marginal educational background.
All I can say about the exclusion of the group here that has been challenged, especially insofar as there are some blacks, is that I cannot say that the reasons that the prosecutor has enunciated are not reasonable. I couldn't seize on any one reason on any particular juror and say that they weren't reasonable. Each one of the reasons that have been announced seems to be plausible. Nobody seeking a death penaly in good judgment would leave a preacher on a jury. We all know that by and large preachers are jurors who are not prone to that sort of thing, and I seldom see preachers left on any jury. I find that even in plaintiff's cases they won't leave them on a jury because people are concerned that the preacher would be too forgiving of someone who runs a stoplight and hits somebody and that he won't be prone to bring back any kind of judgment. I never see preachers left. No sensible prosecutor leaves someone with a prior criminal conviction on the jury. I cannot just categorically say that any of the reasons that the prosecutor has announced are strictly nothing but showing a discrimination against blacks. I can't say that. If we had a black here who was thirty-five years old, with some education, and with some showing of a responsible job background and that juror was struck, I would say that clearly showed an effort absent some specific thing to exclude blacks, but I can't take it that far to say that Mr. Craft is in essence telling the Court an untruth when he says these are the real reasons for striking these people.
The trial court addressed the issue again during the hearing on the motion for a new trial, where he stated:
[I]f I had a venire where there was a reasonably well-educated, reasonably responsible black who appeared to meet most criterion for jury service, and there was no reasonable reason given to exclude that person, I would disallow the prosecution a challenge on that juror. I heard in this case the reasons that the State announced for challenging those jurors; and I came away from that convinced that those were reasons that an intelligent prosecutor would have challenged each one of those jurors whether he had been black, white, or Chinese.
We cannot say that the trial judge erred when he found that the reasons articulated by the prosecutor were racially neutral. The minister was removed because of the perceived sympathy of ministers toward the accused in a criminal prosecution. This is most assuredly a race-neutral explanation. The juror whose brother was convicted of armed robbery can easily be seen as being potentially prejudiced against the prosecution. The reasons for striking the other three jurors are perhaps less quantifiable than the two already discussed; however, they are not necessarily suspect.
One juror who was struck cared for her invalid mother. When denied excusal for this reason, she "rolled her eyes" to express her disapproval and thereafter became unresponsive to the voir dire. The Fifth Circuit, when recently faced with a similar reason, explained why such reason is legitimate:
He [the prosecutor] sensed by her posture and demeanor that she [juror] was hostile to being in court and feared that she might respond negatively to the prosecution simply because the government was responsible for calling her to jury duty.
United States v. Forbes, 816 F.2d 1006, 1010 (5th Cir.1987). Borrowing the rationale of Forbes, we conclude that this juror's prejudice against the state was so obvious as to constitute a race-neutral reason for her removal.
The juror who was struck because he wore a hat into the courtroom and appeared contemptuous of the proceedings is likewise controlled by our borrowed rationale of Forbes. An expression of contempt or hostility may reasonably be assumed to *1352 spell trouble for the prosecution. Such demeanor is a legitimate reason, related to any case, for a prosecutor to exercise a peremptory challenge. In so finding, we join other state courts who have found that demeanor may constitute a racially-neutral reason. See, e.g., Taitano v. State, 4 Va. App. 342, 358 S.E.2d 590 (1987) (dress and demeanor); Chambers v. State, 724 S.W.2d 440, 442 (Tex. Ct. App. 1987) (body english); Yarbough v. State, 732 S.W.2d 86, 90 (Tex. Ct. App. 1987) (demeanor); Smith v. State, 734 S.W.2d 694 (Tex. Ct. App. 1987) (slouched, wore gold chains, rings and watch); Grady v. State, 730 S.W.2d 191, 194 (Tex. Ct. App. 1987) (demeanor); State v. Brown, No. 51,279 (Mo. Ct. App., July 23, 1987) ("counsel must rely upon demeanor ...").
The final black juror was challenged because of his youth, marital status and educational level. While it is true that the prosecutor allowed persons with less education to serve on the jury, none of the white jurors chosen possessed this combination of characteristics of being young, uneducated and unmarried. This combination of characteristics produced a potential juror who could reasonably have been seen by the prosecutor as unstable. Instability is a racially neutral criterion which would be relevant to the prosecution of any case as it would tend to produce a juror unsympathetic to the state. Another recent Fifth Circuit decision also involved a peremptory challenge of a black juror on the basis of this combination of characteristics; the court of appeals found that this was an articulable and specific racially neutral reason. United States v. Cartlidge, 808 F.2d 1064 (5th Cir.1987). Other state courts have likewise held youth, marital status, and employment background, in various combinations, to be racially-neutral reasons. Taitano v. State, 4 Va. App. 342, 358 S.E.2d 590 (1987) (age); Chambers v. State, 724 S.W.2d 440, 442 (Tex. Ct. App. 1987) (age, marital status combined); Townsend v. State, 730 S.W.2d 24, 26 (Tex. Ct. App. 1987) (short term employment, single with children combined); People v. Cartagena, 128 A.D.2d 797, 513 N.Y.S.2d 497, 498 (1987) (educational background, employment history combined); Yarbough v. State, 732 S.W.2d 86, 90 (Tex. Ct. App. 1987) (young and single combined); Smith v. State, 734 S.W.2d 694 (Tex. 1987) (unemployed with no roots in community).
While we have taken great pains to review the reasons articulated by the prosecutor in this case for his use of peremptory strikes to exclude five black potential jurors, and while we find that in this case these reasons are racially neutral, our opinion should not be construed to limit legitimate, racially neutral reasons to the reasons in this case or to hold these reasons to be automatically race-neutral in any other case. We emphasize what the United States Supreme Court pointed out in Batson, that "`[t]here are any number of bases' on which a prosecutor reasonably may believe that it is desirable to strike a juror who is not excusable for cause ... however, the prosecutor must give a `clear and reasonably specific' explanation of his `legitimate reasons' for exercising the challenges." Batson, 476 U.S. at 98, 106 S.Ct. at 1723, 90 L.Ed.2d at 88, n. 20. We, too, recognize that there are any number of reasons to strike a juror that are legitimate and race-neutral. We point these out today as illustrative examples, reiterating that "the prosecutor's explanation need not rise to the level of justifying exercise of a challenge for cause," Batson, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88, but may not include the prosecutor's "assumption  or intuitive judgment  that they [black jurors] would be partial to the defendant because of their share race." Id. See also, Williams v. State, 507 So.2d 50, 52 (Miss. 1987). We place our trust in the trial judges to determine whether or not a discriminatory motive underlies the prosecutor's articulated reasons.
On a separate but related point, Appellant contends that no racially neutral reason may be given by the prosecutor, at the time that he would be dictating those into the record out of the presence of the jury, unless the prospective jurors are questioned about those particular aspects *1353 in the courtroom in the presence of other jurors and a record made. We reject this approach. The Supreme Court in Batson declined to express any views on the techniques used by lawyers seeking to obtain information about the community in which the case is to be tried, or more particularly about the age, education, employment, and economic status of prospective jurors. Batson, 476 U.S. at 89, n. 12, 106 S.Ct. at 1718, n. 12, 90 L.Ed.2d at 82, n. 12. We decline to set any limits on the prosecutor's use of any legitimate informational source heretofore or hereafter available as to jurors. Furthermore, the prosecutor does not have to question a juror in open court about such information before using it as a racially neutral ground to make a peremptory strike, as long as the source of the information and the practice itself are not racially discriminatory.
We offer in Appendix I racially neutral reasons upheld by other courts in an effort to provide some guidance to our trial courts. Again, we emphasize that these are merely illustrative examples.
In conclusion, we find the jury selection to have been properly conducted and affirm the trial judge's finding that jurors were not excluded on the basis of their race.

II.

Did the Submission of the Same Underlying Felonies Used to Elevate the Charge to Capital Murder to Elevate It Once Again in the Penalty Phase Contravene the Proscription Against Double Jeopardy?
Defense counsel did not object on these grounds at the sentencing phase of the trial and is thus procedurally barred. Moreover, the appellant concedes this issue consistently has been decided against him. Billiot v. State, 454 So.2d 445, 465 (Miss. 1984), cert. denied, 469 U.S. 1230, 105 S.Ct. 1232, 84 L.Ed.2d 369, reh. denied, 470 U.S. 1089, 105 S.Ct. 1858, 85 L.Ed.2d 154 (1985); Leatherwood v. State, 435 So.2d 645, 650 (Miss. 1983); Tokman v. State, 435 So.2d 664, 668 (Miss. 1983). We decline to reconsider our previous holdings and find this assignment without merit.

III.

Did the Prosecution's Closing Argument at the Penalty Phase Inject the Impermissible Element of Lockett's Parole Eligibility?
The specific comments complained of under this assignment of error are as follows:
[T]his particular defendant is deserving of no more mercy than being given the death sentence by lethal injection. The reason I say that is this: the Courts have already tried mercy on him. He is not the kind of person that will accept it and straighten up. He is the kind of person that just gets worse. He graduates from an auto theft to a double murder. He does not deserve mercy. Society can't stand mercy where Carl Lockett's involved. Where does he go from here? Where does he go from here.
The mitigating circumstances I can't see but the one. Now, the Judge has instructed you on two. He said the defendant's age weighs in his favor. He is twenty years old. That seems reasonable. I will just say this: It doesn't weigh very high. If he had been sixteen years old, never done anything else, I would say that would weigh high. If he was seventy and we were relatively sure that he would never do this again, that might weigh very high, but where his age is twenty and he has already committed auto theft and now what he has done here today, I would say at that age and the kind of record he has built over it does not give that particular mitigating circumstance very much weight to weigh against the aggravating circumstances.
[H]ow many times should we grant mercy. Perhaps, and I have read somewhere not seven times seven but seventy times seventy, and perhaps that is not correct. We have got a preacher out here in the audience and somebody that can correct me. That is probably not right, but I think it is true. I also recall something about if a person takes your cloak to give him your coat as well, but never have I *1354 read when a person murders two people you give him back his gun and turn him back to do it again.
Lockett's argument is twofold: 1) that the comments alerted the jury to the possibility of parole if he were given a life sentence, and 2) that since the prosecutor knew that Lockett had been given the death penalty in the first trial, the comments regarding parole were gross misstatements of fact.
The quoted comments could not possibly be reasonably construed as inferring parole and are more properly viewed as argument refuting the mitigating effect of Lockett's youth. Further, no objection was made at trial to any of these statements and thus Lockett is procedurally barred from making this argument on appeal. Even if we reach the merits of this issue, we find the statements quoted above to come nowhere near those deemed by this Court to erroneously place before the jury the possibility of the defendant's parole. See Gilliard v. State, 428 So.2d 576, 584 (Miss. 1983) ("[L]ife is ten years and you are eligible then for parole."); Williams v. State, 445 So.2d 798, 812-13 (Miss. 1984) (prosecutor extensively questioned a witness on the amount of time he would serve with a life sentence). This argument is more akin to that which we found to be "fair argument" in Johnson v. State, 477 So.2d 196, 216 (Miss. 1985). See also, Faraga v. State, 514 So.2d 295, 303, (Miss. 1987).

IV.

Did the Admission of Evidence Seized Pursuant to an Invalid Warrant that was Issued by a Partial Magistrate and Never Served Upon the Occupant of the House Searched, and Pursuant to a Warrantless Arrest within His House, Violate Mr. Lockett's Rights under the Fourth, Fifth, Eighth and Fourteenth Amendments?
Here Lockett questions the validity of a search warrant and resulting search of his residence which produced weapons and personal belongings of the Calhouns.
This assignment of error is controlled by our decision in Lockett I, part III A-F, wherein we held the warrant valid and found no error in the admission of evidence gathered during the search.

V.

Were the Confessions Introduced Against Mr. Lockett at Trial Both Involuntary and the Fruit of Illegal Search, Seizure and Arrest?
Lockett begins here by challenging the confessions introduced against him as violative of the Agee rule [Agee v. State, 185 So.2d 671, 673 (Miss. 1966)] in that not all of the officers present during the confession testified at trial.
This assignment is also controlled by our decision in Lockett I, part IV, wherein we held there to be no error because the circuit court had before it substantial evidence to support its decision.

VI.

Did the Introduction in Both Phases of Mr. Lockett's Trial of Evidence and Argument Concerning a Separate Distinct Crime of Murder and Other Crimes Deprive Mr. Lockett of His Rights Under the Constitutions of this State and of the United States?
Lockett next argues that the trial court erred in allowing in evidence of John Calhoun's murder. This case presents the other side of the coin from that addressed in Lockett I, part VI. In Lockett I we found no error by the trial court in admitting numerous references to Mrs. Calhoun's death. We likewise find no error in this trial concerning evidence of Mr. Calhoun's death.
Unlike the case in Lockett I, the other crime here preceded and directly led to Mrs. Calhoun's death. Mrs. Calhoun was present when John Calhoun was shot, and she was forced to assist Lockett in robbing her husband's body. Lockett's own statements suggest he told Mrs. Calhoun she would have to die because she witnessed the crime and she knew who he was. Mrs. Calhoun was taken from her home and *1355 killed within a very short period following her husband's death.
This case was tried May 5 and 6, 1986, and is thus subject to our Mississippi Rules of Evidence. In applying the Rules, there can be no question that evidence of John Calhoun's death is relevant to Mrs. Calhoun's murder. See M.R.E. 404(b), 401, 402. Rule 404(b) states that though it is generally inadmissible, evidence of other wrongs or other crimes "may be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." These exceptions are not exclusive, however. The rules contemplate and we have held that evidence of other crimes is admissible where the charged act and the other sought to be proved are too interconnected to be separated. See, Neal v. State, 451 So.2d 743, 758-59 (Miss. 1984); Lockett I, at 1331.
Even more so than in Lockett I, evidence of John Calhoun's murder was interrelated and inseparable from Mrs. Calhoun's murder; her murder was part of the same transaction. The evidence also just as clearly bears on Lockett's motive for the second murder. The evidence was far more probative than prejudicial. M.R.E. 403.

VII.

Did the Trial Court Err in Submitting to the Jury the Aggravating Circumstance of a Murder Committed By One Under Sentence of Imprisonment?
This assignment is controlled by our decision in Lockett I, part XIII, wherein we rejected this argument as being without merit.

VIII.

Was the Charge on Capital Murder Unacceptably Duplicitous?
The gist of this assigned error is that the instruction given to the jury was that they could convict Lockett of capital murder if they found that he entered the Calhoun home to either steal or do violence to the persons therein.
This assignment is also controlled by our decision in Lockett I, part IX, wherein we held this argument to be procedurally barred.

IX.

Did the Instructions at the Penalty Phase Deprive Mr. Lockett of His Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Under Mississippi Law?
This assignment of error regards the failure of the trial court to give a "mercy instruction," which we rejected in Lockett I, part XVI, and which controls the disposition here.

X.

Is the Death Sentence Imposed Upon Mr. Lockett Disproportionate and the Consequence of Emotion and Caprice?
Having reviewed this case and compared it to other cases, we find that the sentence here is not excessive or disproportionate to the penalty imposed in similar cases. (See Appendix II). This assignment of error is denied.
For all of the above noted reasons, we find no error in the trial below, having reviewed the record as submitted from the Circuit Court of Lamar County; therefore, we affirm the conviction of capital murder and sentence of death and set Wednesday, November 25, 1987, as the date for execution by lethal injection.
AFFIRMED.
WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., and GRIFFIN, J. concur.
PRATHER, SULLIVAN and ANDERSON, JJ., concur in part, dissent to part IV.
ROBERTSON, J., concurs in part, dissents to parts I and IV.

*1356 APPENDIX I
Taitano v. State, 4 Va. App. 342, 358 S.E.2d 590 (1987)
lived near the defendant
lived in a "high crime" area
age
dress
demeanor
Chambers v. State, 724 S.W.2d 440, 442 (Tex. Ct. App. 1987)
member of a fringe religious group
body english
age
marital status
handwriting
name association
Hughes v. State, 257 Ga. 200, 203-04, 357 S.E.2d 80, 84 (1987)
more blacks knew about the case
Rodgers v. State, 725 S.W.2d 477, 480 (Tex. Ct. App. 1987)
prosecutor distrusted juror
inconsistency between oral responses and juror's card
failure to complete juror's card
relative in a contemporaneous criminal proceeding
employed by the police department
Townsend v. State, 730 S.W.2d 24, 26 (Tex. Ct. App. 1987)
lack of eye contact and attentiveness
short term employment
single with children
indefinite answer on juror's card
illegible juror's card
People v. Cartagena, 128 A.D.2d 797, 513 N.Y.S.2d 497, 498 (1987)
educational background
employment history
employment of spouse and children
criminal record
Yarbough v. State, 732 S.W.2d 86, 90 (Tex. Ct. App. 1987)
demeanor
previously a juror in a mistrial
previously arrested for theft
young and single
smiled at defendant
no religious preference
Williams v. State, 507 N.E.2d 997, 998 (Ind. App. 1987)
father of juror imprisoned for some crime
defense attorney previously represented juror
juror a social worker (rape case)
State v. Brown, 507 So.2d 304, 309 (La. App. 1987)
prosecutor convicted brother
defense attorney previously represented juror
State v. Lowmaster, 406 N.W.2d 15, 17 (Minn.App. 1987)
home health worker (believed to be more susceptible to claim of self-defense)
Smith v. State, 734 S.W.2d 694 (Tex. Ct. App. 1987)
friend charged with a crime
unemployed with no roots in community
slouched, wore gold chains, rings and watch
Grady v. State, 730 S.W.2d 191, 194 (Tex. Ct. App. 1987)
family member arrested, young and single
previously on a hung jury and demeanor
State v. Brown, No. 51,279 (Mo. Ct. App. July 23, 1987)
"Counsel must rely upon demeanor, gender, ethnic background, employment, marital status, age, economic status, social position, religion, and many other basic background facts."
U.S. v. Woods, 812 F.2d 1483, 1485 (4th Cir.1987)
Black juror listed himself as non-demoninational, frequently visiting various churches in the area. He may have been a constituent of defendant's church at various times.
juror had been exposed to inflammatory and racial pre-trial publicity by reading an account of the incident in a predominantly black newspaper.
a close relative of the juror had been convicted of DUI.
juror was a member of a fraternity unknown to prosecution.
NOTE: All these reasons were a combination for one juror.
*1357 U.S. v. Forbes, 816 F.2d 1006, 1010 (5th Cir.1987)
juror's two sons had been in trouble with the law
posture and demeanor indicated juror was hostile to being in court
U.S. v. Mathews, 803 F.2d 325, 331 (7th Cir.1986)
juror had grave reservation with respect to her ability to adequately look at and appraise the tape recording evidence
juror arrived late, indicating a lack of commitment to the importance of the proceedings. She was also inattentive to the proceedings.
juror was examining prosecutor in a way that was becoming particularly hostile.
U.S. v. Cartlidge, 808 F.2d 1064, 1070-71 (5th Cir.1987)
juror knew defendant's counsel
young, single, unemployed (related to this particular case because defendant was in a severe financial condition)
juror avoided eye contact with prosecutor
juror's brother had been convicted of robbery (this particular case involved conspiracy to import, possess and distribute marijuana)
alternate prospective juror was divorced and appeared to have a low income occupation.
U.S. v. Love, 815 F.2d 53, 54 (8th Cir.1987)
government removed the sole black juror because he had heard of the business owned by a person whom the government expected would be called as an alibi witness for defendant; district court found this to be a permissible reason, and circuit court upheld it.

APPENDIX II

DEATH CASES AFFIRMED BY THIS COURT:
Bullock v. State, (Miss. September 2, 1987).
Cole v. State, (Miss. July 19, 1987).
Faraga v. State, 514 So.2d 295 (Miss. 1987).
Jones v. State, 517 So.2d 1295 (Miss. 1987).
Wiley v. State, 484 So.2d 339 (Miss. 1986).
Johnson v. State, 477 So.2d 196 (Miss. 1985).
Gray v. State, 472 So.2d 409 (Miss. 1985).
Cabello v. State, 471 So.2d 332 (Miss. 1985).
Jordan v. State, 464 So.2d 475 (Miss. 1985).
Wilcher v. State, 455 So.2d 727 (Miss. 1984).
Billiot v. State, 454 So.2d 445 (Miss. 1984).
Stringer v. State, 454 So.2d 468 (Miss. 1984).
Dufour v. State, 453 So.2d 337 (Miss. 1984).
Neal v. State, 451 So.2d 743 (Miss. 1984).
Booker v. State, 449 So.2d 209 (Miss. 1984).
Wilcher v. State, 448 So.2d 927 (Miss. 1984).
Caldwell v. State, 443 So.2d 806 (Miss. 1983).
Irving v. State, 441 So.2d 846 (Miss. 1983).
Tokman v. State, 435 So.2d 664 (Miss. 1983).
Leatherwood v. State, 435 So.2d 645 (Miss. 1983).
Hill v. State, 432 So.2d 427 (Miss. 1983).
Pruett v. State, 431 So.2d 1101 (Miss. 1983).
Gilliard v. State, 428 So.2d 576 (Miss. 1983).
Evans v. State, 422 So.2d 737 (Miss. 1982).
King v. State, 421 So.2d 1009 (Miss. 1982).
Wheat v. State, 420 So.2d 229 (Miss. 1982).
Smith v. State, 419 So.2d 563 (Miss. 1982).
Johnson v. State, 416 So.2d 383 (Miss. 1982).
Edwards v. State, 413 So.2d 1007 (Miss. 1982).
Bullock v. State, 391 So.2d 601 (Miss. 1980).
Reddix v. State, 381 So.2d 999 (Miss. 1980).
Jones v. State, 381 So.2d 983 (Miss. 1980).
Culberson v. State, 379 So.2d 499 (Miss. 1979).
Gray v. State, 375 So.2d 994 (Miss. 1979).
Jordan v. State, 365 So.2d 1198 (Miss. 1978).
*1358 Voyles v. State, 362 So.2d 1236 (Miss. 1978).
Irving v. State, 361 So.2d 1360 (Miss. 1978).
Washington v. State, 361 So.2d 61 (Miss. 1978).
Bell v. State, 360 So.2d 1206 (Miss. 1978).

DEATH CASES REVERSED AS TO GUILT PHASE AND SENTENCE PHASE:
Davis v. State, 512 So.2d 1291 (Miss. 1987).
Williamson v. State, 512 S.2d 868 (Miss. 1987).
Foster v. State, 508 So.2d 1111 (Miss. 1987).
Smith v. State, 499 So.2d 750 (Miss. 1986).
West v. State, 485 So.2d 681 (Miss. 1985).
Fisher v. State, 481 So.2d 203 (Miss. 1985).
Johnson v. State, 476 So.2d 1195 (Miss. 1985).
Fuselier v. State, 468 So.2d 45 (Miss. 1985).
West v. State, 463 So.2d 1048 (Miss. 1985).
Jones v. State, 461 So.2d 686 (Miss. 1984).
Moffett v. State, 456 So.2d 714 (Miss. 1984).
Lanier v. State, 450 So.2d 69 (Miss. 1984).
Laney v. State, 421 So.2d 1216 (Miss. 1982).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT:
Edwards v. State, 441 So.2d 84 (Miss. 1983).
Dycus v. State, 440 So.2d 246 (Miss. 1983).
Coleman v. State, 378 So.2d 640 (Miss. 1979).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY:
Stringer v. State, 500 So.2d 928 (Miss. 1986).
Pinkton v. State, 481 So.2d 306 (Miss. 1985).
Mhoon v. State, 464 So.2d 77 (Miss. 1985).
Cannaday v. State, 455 So.2d 713 (Miss. 1984).
Wiley v. State, 449 So.2d 756 (Miss. 1984).
Williams v. State, 445 So.2d 798 (Miss. 1984).
PRATHER, Justice, concurring in part, dissenting in part.
I dissent to the majority opinion respecting the invalid search warrant question discussed in Part IV. My views concerning the invalidity of the search warrant are set forth in the dissenting opinion of Justice Robertson in Lockett v. State of Mississippi, 517 So.2d 1317 (referred to as Lockett I). On the other issues of this majority opinion, I concur.
The result of this dissenting vote would reverse Lockett's capital murder conviction and remand for a new trial.
SULLIVAN and ANDERSON, JJ., join this opinion.
ROBERTSON, Justice, concurring in part, dissenting in part:

I.
I concur in what the majority opinion recites in Parts II, III, V, VI, VII, VIII, IX, and X. On Part VI, relating to evidence of the killing of John Calhoun, I comment to emphasize the distinction between this case and Lockett I wherein I dissent. On Part IV, I dissent in that I do not regard the search warrant as having been issued by a neutral and detached magistrate (see my separate opinion in Lockett I); otherwise I concur. I dissent on the Batson claim, Part I of the majority opinion.

II.
I concur in much of what is said in the majority's meticulous consideration of Lockett's Batson claim. My problem is that the gut issue  pattern exclusion of all black jurors  is never reached.
To be specific, I agree that, considered singly, the reasons given by the prosecutor for each of the five (5) peremptory challenges of black jurors is racially neutral within Batson. Seen individually, the circuit court's ruling on the reasons for each strike is beyond our authority to disturb. But, in deciding whether the defendant has *1359 made the requisite showing, Batson states that
a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination.
Batson, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. I couple this with the majority's acknowledgement that Batson suggests Title VII employment discrimination cases as an appropriate analogy upon which courts may draw in considering claims of systematic peremptory challenges of black jurors. See Batson, 476 U.S. at 94-96 ns. 18 and 19, 106 S.Ct. at 1721-22 ns. 18 and 19, 90 L.Ed.2d at 86-87, ns. 18 and 19.
Thus seen, the question is whether Lockett's Batson rights were violated when the prosecution challenged peremptorily five (5) out of five (5) black jurors. The question is answered by reference to statistical probability.
The probability of the prosecutor using all challenges in this manner by chance, with no discriminatory intent, gives a level of significance of approximately 0.XXXXXXXXXXX. This is computed by Sir. Ronald Fisher's Exact Test (Hyper-Geometric Distribution). See, e.g., Mosteller, Rourke and Thomas, Probability with Statistical Application (Addison-Wesley, 2d Ed. 1970), cited with approval, Castaneda v. Partida, 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977). In the discrimination cases relied upon in Batson, a significant level of probability is generally approximately 1.96 standard deviations from the norm, a level of significance of 0.05. See, e.g., Hazelwood School District v. United States, 433 U.S. 299, 311-12 n. 17, 97 S.Ct. 2736, 2743 n. 17, 53 L.Ed.2d 768, 779-80 n. 17 (1977). The common sense point is this: the chances of the prosecutor having employed Batson-legitimate non-discriminatory reasons in striking peremptorily all five (5) black jurors are slim to none.
It has been ninety (90) years since Holmes prophesied that "the man of the future is the man of statistics... ." Holmes, The Path Of The Law, 10 Harv.L. Rev. 457, 469 (1897). The prophesy has been fulfilled as many courts and lawyers rely regularly upon statistical methods in establishing facts and their patterns. See Barnes, Statistics as Proof: Fundamentals of Quantitative Evidence (1983); see generally Ackerman, Reconstructing American Law (1984). I do not understand why today we eschew that which elsewhere has become so routine.

III
In Lockett I I dissented from the majority's holding that evidence of the killing of Geraldine Calhoun was admissible when Lockett was on trial for the capital murder of John Calhoun. Here the facts are reversed and I see the matter differently.
Under Rules 401 and 404(b), Miss.R.Ev., I consider that the prosecution was entitled to prove substantially everything that happened from the time Carl Lockett first accosted Geraldine Calhoun in her home on the morning of December 13, 1985, until he killed her in the chicken house later that morning. Among that which happened as a part of this sequence of events was the killing of John Calhoun. Specifically, Lockett killed John Calhoun after he commenced his offense against Geraldine Calhoun and before he completed it. The killing of John Calhoun was thus a part of the rational and coherent story the prosecution was entitled to tell.
The Rule 403 inquiry, to be sure, is close. As the killing of John Calhoun was not nearly so heinous, atrocious or cruel as that of Geraldine Calhoun, I would not disturb the circuit court's determination that probative value was not substantially outweighed by prejudice to the defendant.

IV
The net effect of the views I express above is that I would reverse Lockett's capital murder conviction and remand for a new trial. In the alternative, I would reverse and remand for a new sentencing hearing.
NOTES
[1] We noted the rough contours of this question in Williams, 507 So.2d at 52, where we noted the elements of proof and stated further that the defendant mounting such a challenge "is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits `those to discriminate who are of a mind to discriminate.' Id., citing Avery v. Georgia, 345 U.S. 559, 562, 73 S.Ct. 891, 892, 97 L.Ed. 1244 (1953).